IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

SPINSCI TECHNOLOGIES, LLC, §
§
Plaintiff, §
§ Civil Action No. 3:18-CV-0344-D
VS. §
§
J PROJECTS, LLC, §
§
Defendant. §

MEMORANDUM OPINION
AND ORDER

In this action by plaintiff SpinSci Technologies, LLC ("SpinSci") seeking a

declaratory judgment as to its contractual rights vis-à-vis defendant J Projects, LLC ("J

Projects"), J Projects moves to dismiss under Fed. R. Civ. P. 12(b)(2) for lack of personal

jurisdiction, and moves under Rule 12(b)(6) to dismiss in part the claims in SpinSci's first

amended complaint and request for declaratory relief ("first amended complaint") for failure

to state a claim on which relief can be granted. For the reasons that follow, the court denies

J Projects' Rule 12(b)(2) motion, grants J Projects' Rule 12(b)(6) motion, and grants SpinSci

leave to replead.

I

The following facts are taken from the affidavits submitted by the parties and from

the allegations of SpinSci's first amended complaint.[1]

---

[1]The first amended complaint was filed under seal. The motion to dismiss and related
pleadings, however, are not sealed. Accordingly, the court will refer to the allegations of the
first amended complaint as if it were a public document, and it will file this memorandum

SpinSci is a technology firm, founded more than ten years ago, that "offer[s] contact center solutions, applications, tools, packaged solutions, and services across a wide range of industries." 1st Am. Compl. ¶ 25. It is a Texas limited liability company that maintains its headquarters in Irving, Texas. J Projects is a New York limited liability company headquartered in New York. Jason T. Tepper ("Tepper"), who at one time was a defendant in this lawsuit,[2] founded J Projects for the purpose of providing business consulting services to SpinSci.

SpinSci and J Projects began their business relationship in October 2010 by entering into three contracts: a non-disclosure agreement ("NDA"); a business consulting agreement; and a statement of work. J Projects sent these documents to SpinSci in Texas, where SpinSci signed them.

In August 2013 SpinSci and J Projects entered into a second set of contracts—a new business consulting agreement ("2013 Agreement" or "Agreement"), and a statement of work ("SOW") incorporated by reference—that form the basis of this lawsuit. The Agreement provides that it is "governed by the laws of the State of New York and Texas." 1st Am. Compl. ¶ 7 n.1. Under the terms of the Agreement, J Projects consulted with SpinSci on questions of business strategy and development and solicited customers on SpinSci's behalf

opinion and order as a public document.

[2]SpinSci originally sued J Projects and Tepper. In SpinSci's response to defendants' motion to dismiss SpinSci's state-court original petition, however, SpinSci stated that it had dropped its claims against Tepper, individually, in its first amended complaint. *See* P. 3/13/18 Resp. to D. Mot. Dismiss 1 n.1. Accordingly, only J Projects remains as a defendant.

throughout the United States and abroad.  The substantial majority of J Projects' consulting work was performed remotely from its headquarters in New York,[3] but J Projects' other duties under the Agreement required extensive domestic travel.  Over the course of the parties' seven-year relationship, J Projects took 31 business trips on SpinSci's behalf, five of which were to Texas.[4]

A significant portion of J Projects' work under the Agreement related to SpinSci's support of Cisco Services, Inc.'s ("Cisco") operations in Richardson, Texas—specifically,

---

[3]J Projects asserts, without qualification, that its consulting services were provided from New York.  The first amended complaint alleges, however, that J Projects "provided consulting and advisory work *in Texas* . . . for more than seven years."  1st Am. Compl. ¶ 7 (emphasis added).  Because the court is deciding J Projects' Rule 12(b)(2) motion without conducting an evidentiary hearing, any factual conflicts at this stage must be resolved in favor of SpinSci.  *See, e.g., Latshaw v. Johnston*, 167 F.3d 208, 211 (5th Cir. 1999) (holding that when court rules on motion to dismiss for lack of personal jurisdiction without holding evidentiary hearing, it must accept as true the uncontroverted allegations in the complaint and resolve in plaintiff's favor any factual conflicts posed by the affidavits).  Nonetheless, the court does not read this paragraph of the first amended complaint as suggesting that J Projects was somehow physically located in Texas for seven years, since this would contradict other portions of the same complaint that assert that J Projects took a number of trips *to* Texas.  The court instead understands the first amended complaint to allege that J Projects provided consulting services during its trips to Texas, and that these trips occurred throughout the parties' seven-year relationship.

[4]It should be noted that J Projects took only 27 trips on SpinSci's behalf after the 2013 Agreement was signed, four of which were to Texas; the total of 31 trips includes travel undertaken pursuant to prior agreements between the parties.  Because both parties take into account all 31 trips in their arguments, however, and because the difference between four trips and five trips to Texas is *de minimis* for purposes of the court's minimum contacts analysis, the court will use the 5 of 31 measure throughout this memorandum opinion and order.

the Cisco Customer Interaction Center Lab/Demo Support Platform ("CCIC Lab").[5]  J Projects' trips to Texas were for the purpose of visiting SpinSci's Irving headquarters and Cisco's Richardson offices.  In total, the work J Projects performed in relation to the CCIC Lab produced 75% to 80% of the total revenue generated for SpinSci by the Agreement, and entitled J Projects to around $470,000 in commissions.  Moreover, of the 6,308.5 total hours J Projects worked pursuant to the Agreement, 1,077 hours—or more than 17%—involved the CCIC Lab or other Texas projects.

In February 2017 SpinSci and J Projects began to negotiate regarding certain disagreements that they were having concerning the meaning of the 2013 Agreement and the NDA. The parties disagree about whether J Projects is entitled to (i) an ownership interest in SpinSci, or any other right to the proceeds resulting from the future sale or change in ownership of SpinSci; (ii) a refund of certain discounts originally included in J Projects' commission rate; (iii) additional commission payments beyond what J Projects has already received; and (iv) 50% ownership of certain intellectual property generated by the parties during the course of the Agreement.

In the context of these negotiations, SpinSci initiated the instant lawsuit in Texas state

---

[5]The parties seem to disagree on where the CCIC Lab is located.  J Projects contends that, during the term of the Agreement, the CCIC Lab moved to North Carolina.  *See* Tepper Aff. ¶ 51.  But SpinSci plainly asserts that the "CCIC Lab *is* located at Cisco's Richardson, Texas campus."  1st Am. Compl. ¶ 17 (emphasis added).  At this stage of the litigation, because the court is deciding J Projects' Rule 12(b)(2) motion without conducting an evidentiary hearing, it must accept as true the uncontroverted allegations of the first amended complaint and resolve in SpinSci's favor any factual conflicts posed by the affidavits.  *See* *Latshaw*, 167 F.3d at 211.

court in November 2017, seeking a declaratory judgment concerning the parties' contractual rights. J Projects maintains that it was not immediately served with process or otherwise made aware of the suit.

In January 2018 J Projects sued SpinSci in New York state court (the "New York Suit"). The New York Suit was later removed to the Northern District of New York. After the New York Suit was initiated, SpinSci served J Projects with process in the present case, and J Projects later removed this case to this court.

Following the removal of this case, J Projects moved to dismiss SpinSci's state-court original petition. The court denied the motion without prejudice after SpinSci filed the first amended complaint. J Projects now moves to dismiss this action under Rule 12(b)(2), contending that the court lacks personal jurisdiction over J Projects. J Projects also moves under Rule 12(b)(6) to dismiss in part SpinSci's first amended complaint for failure to state a claim on which relief can be granted, to the extent that SpinSci requests a declaratory judgment that J Projects has no right to the proceeds of any future sale, change in ownership, or other exit event involving SpinSci. SpinSci opposes the motions.

II

The court first considers J Projects' Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction.

A

"When a nonresident defendant presents a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing the district court's jurisdiction over

the nonresident." *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985) (citing *Thompson v. Chrysler Motors Corp.*, 755 F.2d 1162, 1165 (5th Cir. 1985); *D.J. Invs., Inc. v. Metzeler Motorcycle Tire Agent Gregg, Inc.*, 754 F.2d 542, 545 (5th Cir. 1985)).  The determination whether a federal district court has *in personam* jurisdiction over a nonresident defendant is bipartite.  The court first decides whether the long-arm statute of the state in which it sits confers personal jurisdiction over the defendant.  If it does, the court then resolves whether the exercise of jurisdiction is consistent with due process under the United States Constitution.  *See Mink v. AAAA Dev. LLC*, 190 F.3d 333, 335 (5th Cir. 1999).  Because the Texas long-arm statute extends to the limits of due process, the court need only consider whether exercising jurisdiction over J Projects would be consistent with the Due Process Clause of the Fourteenth Amendment.  *See id.*; *Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 214 (5th Cir. 2000).

> The Due Process Clause of the Fourteenth Amendment permits the exercise of personal jurisdiction over a nonresident defendant when (1) that defendant has purposefully availed itself of the benefits and protections of the forum state by establishing "minimum contacts" with the forum state; and (2) the exercise of jurisdiction over that defendant does not offend "traditional notions of fair play and substantial justice."  To comport with due process, the defendant's conduct in connection with the forum state must be such that it "should reasonably anticipate being haled into court" in the forum state.

*Latshaw v. Johnston*, 167 F.3d 208, 211 (5th Cir. 1999) (footnotes omitted) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).  To determine whether exercising jurisdiction would

- 6 -

satisfy traditional notions of fair play and substantial justice, the court examines (1) the defendant's burden, (2) the forum state's interests, (3) the plaintiff's interests in convenient and effective relief, (4) the judicial system's interest in efficient resolution of controversies, and (5) the states' shared interest in fundamental social policies. *Ruston Gas Turbines, Inc. v. Donaldson Co.*, 9 F.3d 415, 421 (5th Cir. 1993).

A defendant's contacts with the forum may support either specific or general jurisdiction over the defendant. *Mink*, 190 F.3d at 336. "For the court properly to assert specific personal jurisdiction, the defendant must have 'purposefully directed' his activities at residents of the forum, and the litigation must result from alleged injuries that 'arise out of or relate to' the defendant's activities directed at the forum." *Archer & White, Inc. v. Tishler*, 2003 WL 22456806, at *2 (N.D. Tex. Oct. 23, 2003) (Fitzwater, J.) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)). "General jurisdiction exists when a defendant's contacts with the forum state are unrelated to the cause of action but are 'continuous and systematic.'" *Id.* (quoting *Mink*, 190 F.3d at 336). "[A] court may assert jurisdiction over a foreign corporation 'to hear any and all claims against [it]' only when the corporation's affiliations with the State in which suit is brought are so constant and pervasive 'as to render [it] essentially at home in the forum State.'" *Daimler AG v. Bauman*, 571 U.S. 117, 122 (2014) (first brackets added) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)).[6]

_____

[6]Because the court holds that J Projects' contacts with Texas are sufficient to support specific jurisdiction, it need not decide whether J Projects is also subject to general

When deciding a motion to dismiss for lack of personal jurisdiction, the court is not limited to considering the facts pleaded in the complaint. *See Walk Haydel & Assocs. v. Coastal Power Prod. Co.*, 517 F.3d 235, 241 (5th Cir. 2008). Rather, "the district court may receive any combination of the recognized methods of discovery, including affidavits, interrogatories, and depositions to assist it in the jurisdictional analysis." *Tendeka, Inc. v. Glover*, 2014 WL 978308, at *3 (S.D. Tex. Mar. 12, 2014) (Rosenthal, J.) (internal quotations omitted). "The district court usually resolves the jurisdictional issue without conducting a hearing." *Ham v. La Cienega Music Co.*, 4 F.3d 413, 415 (5th Cir. 1993) (footnote omitted).

> When a court rules on a motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing, it must accept as true the uncontroverted allegations in the complaint and resolve in favor of the plaintiff any factual conflicts posed by the affidavits. Therefore, in a no-hearing situation, a plaintiff satisfies his burden by presenting a *prima facie* case for personal jurisdiction.

*Latshaw*, 167 F.3d at 211 (footnotes omitted). "This liberal standard, however, does not require the court to credit conclusory allegations, even if they remain uncontradicted." *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 2000 WL 35615925, at *2 (N.D. Tex. Sept. 15, 2000) (Fitzwater, J.) (citing *Felch v. Transportes Lar-Mex SA DE CV*, 92 F.3d 320, 326 n.16 (5th Cir. 1996)), *aff'd*, 253 F.3d 865, 869 (5th Cir. 2001) (per curiam) (affirming, *inter alia*, this conclusion).

---

jurisdiction in this forum.

B

The court holds that SpinSci has made a prima facie showing that J Projects has sufficient contacts with this forum to support the exercise of specific jurisdiction. Specific jurisdiction analysis "focuses on the relationship among the defendant, the forum, and the litigation," *Stuart*, 772 F.2d at 1190 (footnote omitted) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 413 (1984)), and is a "claim-specific inquiry," *McFadin v. Gerber*, 587 F.3d 753, 759 (5th Cir. 2009). When analyzing a claim arising from a contract, "only those acts which relate to the formation of the contract and the subsequent breach are relevant." *See Religious Tech. Ctr. v. Liebreich*, 339 F.3d 369, 375 (5th Cir. 2003).[7] The analysis "includes 'prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing.'" *Trois v. Apple Tree Auction Ctr., Inc.*, 882 F.3d 485, 489 (5th Cir. 2018) (quoting *Burger King*, 471 U.S. at 479). "The 'minimum contacts' inquiry is fact intensive and no one element is

---

[7]In practice, the Fifth Circuit appears to focus more on the formation of the contract than the circumstances of the alleged breach. *See, e.g., Moncrief Oil Int'l Inc. v. OAO Gazprom*, 481 F.3d 309, 312-13 (5th Cir. 2007) (considering terms of contract and parties' expectations at time of formation); *Religious Tech. Ctr.*, 339 F.3d at 375 (analyzing negotiation and execution of contract). In the present case, such a focus is particularly apt because SpinSci is seeking a declaratory judgment that its actions did *not* breach the Agreement. The issue of personal jurisdiction turns, of course, on the actions the defendant took and what the defendant could foresee. "A plaintiff's or third party's unilateral activities cannot establish minimum contacts between the defendant and forum state." *Moncrief Oil*, 481 F.3d at 311. It would therefore be improper to conclude that a court sitting in Texas could exercise personal jurisdiction over J Projects based actions that SpinSci took or planned to take in Texas and that SpinSci maintains did not or would not breach the Agreement.

decisive; rather the touchstone is whether the defendant's conduct shows that it 'reasonably anticipates being haled into court.'" *McFadin*, 587 F.3d at 759 (quoting *Luv n' care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 470 (5th Cir. 2006)).

Given the fact-bound nature of the inquiry, it can be helpful to compare the facts of the present case with the facts of Fifth Circuit decisions that have either found or declined to find specific jurisdiction. *See, e.g., Lansing Trade Grp., LLC v. 3B Biofuels GmbH & Co., KG*, 612 F.Supp.2d 813, 821-29 (S.D. Tex. 2009) (Rosenthal, J.) (using this mode of analysis when addressing whether court had personal jurisdiction). Although SpinSci and J Projects both frame their personal jurisdiction arguments exclusively in terms of the 2013 Agreement, one of the claims at issue—that J Projects is not owed any ownership interest in certain intellectual property—actually derives from the NDA signed in 2010. The court will therefore analyze separately the relevant jurisdictional contacts for each of these two contracts.

## C

### 1

In entering into the Agreement, J Projects engaged in minimum contacts with Texas that support the exercise of specific jurisdiction regarding SpinSci's Agreement-related claims. SpinSci supports its jurisdictional argument with the following facts: (1) J Projects was founded for the purpose of doing business with SpinSci, a Texas-based company; (2) J Projects initiated a contractual relationship between the two companies by sending the initial draft of a business consulting agreement to SpinSci in 2010; (3) nearly three years later, J

Projects entered into the 2013 Agreement with SpinSci, a Texas company, in continuation of their longstanding relationship; (4) the relationship between the parties lasted another four years after that; (5) SpinSci signed all relevant contracts in Texas, and performed in Texas by sending payments from there and providing network resources based there; (6) J Projects partially performed in Texas by traveling there five times over the course of the parties' relationship; (7) J Projects has asserted an ownership interest in SpinSci, a Texas company; (8) the Agreement contains a choice-of-law clause that provides that it is governed by the laws of the States of New York and Texas; and (9) J Projects' work outside of Texas was substantially related to SpinSci's Texas-based operations: over 75% of the revenue generated for SpinSci by J Projects under the Agreement came from SpinSci's work for the CCIC Lab, and more than 17% of the hours J Projects worked under the Agreement involved the CCIC Lab or other Texas projects.

SpinSci cites *Command-Aire Corp. v. Ontario Mechanical Sales & Service Inc.*, 963 F.2d 90 (5th Cir. 1992), for the proposition that initiating a long-term contractual relationship with a company the defendant knows to be based in Texas is evidence of minimum contacts with the forum. In *Command-Aire* the defendant—a Canadian corporation with its principal place of business in Canada—had previously entered into a long-term sales representative agreement with the Texas-based plaintiff, under which the defendant marketed and made "bookings" for the plaintiff's products. *Id.* at 93. The parties then began discussing the defendant's possible purchase of certain heat pump equipment manufactured by the plaintiff. *Id.* The defendant sent a representative to Texas to discuss the details of the sale, and the

parties subsequently agreed that the defendant would pick up the equipment in Texas. *Id.* The defendant did so, installed the heat pumps in Ontario, and then claimed the pumps were defective. *Id.* The Fifth Circuit, in holding that the district court could assert specific jurisdiction over the defendant, noted that the defendant performed its side of the agreement in Texas by taking delivery there and by mailing payments there, and that the selection of Texas as the place of performance was not "unilateral." *See id.* at 94-95. The court emphasized that "[the defendant], which had dealt with [plaintiff] for several years, purposefully engaged the Texas manufacturing facility and dealt with its personnel there. . . . [Defendant] had an ongoing relationship with [plaintiff] and initiated discussion, negotiations, and the ultimate contract respecting the sale." *Id.*

The present case is similar to *Command-Aire* in some significant respects. As in *Command-Aire*, by the time the parties signed the 2013 Agreement, they already had an existing contractual relationship—and J Projects was certainly aware that SpinSci was based in Texas. J Projects was founded for the purpose of providing services to SpinSci in particular. As of 2013, J Projects had already been doing business with SpinSci for three years under previous business consulting agreements, and had visited Irving, Texas—the location of SpinSci's offices—at least once. *See* D. Mot. Dismiss App. 11. The Agreement itself envisioned a continuing, long-term relationship between the parties, and actually resulted in a relationship that lasted until June 2017.

The *Command-Aire* panel also gave substantial weight to the place of performance. *See Command-Aire*, 963 F.2d at 94. The defendant there performed the bulk of its

contractual obligations in Texas; the longstanding relationship between the parties was significant, at least in part, because it showed that the parties' choice of Texas as the place of performance was not random. *See id.* Here, J Projects also performed some of its obligations in Texas, during its five trips to the state. Although the bulk of J Projects' work was performed in New York or elsewhere, J Projects' trips certainly made Texas a foreseeable forum, not merely a random or fortuitous one, based on the parties' past dealings. *Cf. Command-Aire*, 963 F.3d at 94-95. Much of the reasoning of *Command-Aire* comfortably applies here.

The Fifth Circuit's decision in *Central Freight Lines, Inc. v. APA Transport Corp.*, 322 F.3d 376 (5th Cir. 2003), also supports the exercise of specific jurisdiction. In *Central Freight* the parties—two freight delivery companies—entered into an "interline agreement" that provided that each one could use the other's services in the other's primary region of operation. *See id.* at 379. The plaintiff was based in Waco, Texas; the defendant was based in New Jersey. *Id.* The parties negotiated the agreement by telephone and by mail, aside from one brief visit to Texas by two representatives of the defendant. *Id.* at 382. Although the plaintiff did ship goods to the defendant's freight terminal in New Jersey pursuant to the interline agreement, the defendant never shipped anything to Texas. *See id.* at 379. The Fifth Circuit nonetheless held that the defendant was amenable to suit in Texas. *Id.* at 385. Instead of emphasizing the anticipated place of performance, the court relied on the fact that the defendant "specifically and deliberately 'reached out' to a Texas corporation by telephone and mail with the deliberate aim of entering into a long-standing contractual

relationship with a Texas corporation." *Id.* at 382 (citing *Burger King*, 471 U.S. at 479-80). In so doing, the defendant "knew that it was affiliating itself with an enterprise based primarily in Texas." *Id.* And although the defendant never performed in Texas, it "took 'purposeful and affirmative action' by entering into the Interline Agreement . . . that had the clearly 'foreseeable' effect of 'causing business activity in the forum state.'" *Id.* (quoting *Miss. Interstate Exp., Inc. v. Transpo, Inc.*, 681 F.2d 1003, 1007 (5th Cir. 1982)).

Many of the factors that controlled the outcome in *Central Freight* are also present here. As discussed above, SpinSci has made a prima facie showing that J Projects purposefully and deliberately reached out to SpinSci—a Texas-based company—to establish a long-term business relationship. Under the reasoning of *Central Freight*, that fact is significant in its own right. *See also Burger King*, 471 U.S. at 475 (noting that defendant who "has created 'continuing obligations' between himself and residents of the forum" may be subject to personal jurisdiction there). Although the record does not indicate whether J Projects visited SpinSci in person for purposes of negotiating the Agreement, the Fifth Circuit in *Central Freight* gave little weight to the defendant's sole visit to the forum state, relying instead telephonic and mail communications that the defendant made to the forum. *See Cent. Freight*, 322 F.3d at 382. And here, unlike in *Central Freight*, the defendant actually did perform part of its contractual obligations in Texas. By factual analogy, *Central Freight* lends support to the conclusion that the court can exercise specific jurisdiction over J Projects.

J Projects, meanwhile, points for support to *Holt Oil & Gas Corp. v. Harvey*, 801 F.2d

773 (5th Cir. 1986). In that case the plaintiff, Holt Oil & Gas Company ("Holt Oil"), an oil and gas company based in Dallas, Texas, brought suit in federal court in Texas against Ralph Harvey ("Harvey"), an Oklahoma resident who was in the business of investing in oil drilling ventures. *Id.* at 776. Holt Oil wanted to drill on property located in Oklahoma, but discovered that Harvey owned part of the leasehold interest in the proposed drill site. *Id.* The parties then negotiated and executed a joint operating agreement under which Harvey agreed to pay some of the costs incurred in drilling an initial well. *Id.* This well encountered numerous difficulties during the drilling effort and was ultimately unsuccessful. After Harvey refused to pay any expenses associated with drilling the well or incurred in a related "sidetracking operation," Holt Oil sued Harvey in this court (Fish J.). *Id.* Harvey moved to dismiss for lack of personal jurisdiction, but Judge Fish denied the motion. *Id.*

Following a trial in which the jury found in favor of Holt Oil, Harvey appealed. *Id.* at 777. The Fifth Circuit affirmed, holding, in pertinent part, that Harvey's limited contacts with Texas were insufficient to support the exercise of specific jurisdiction. *Id.* at 778. The panel reasoned that, although the contractual relationship between Holt Oil and Harvey may have been cemented in Texas, the significance of this fact was diminished because the relevant contract provided that it would be governed by Oklahoma law. *Id.* Moreover, performance of the contract was centered in Oklahoma rather than in Texas. *Id.* And given that the material performance occurred in Oklahoma, the fact that Harvey mailed payments to Texas did not weigh heavily in the court's determination. *Id.* The panel held that the exchange of communications between Texas and Oklahoma in the course of developing and

carrying out the contract was also insufficient to constitute the purposeful availment of the benefits and protections of Texas law because these communications to Texas rested on nothing more than the mere fortuity that Holt Oil happened to be a resident of the Texas forum. *Id.* Because the court held, however, that the district court could exercise general jurisdiction, it upheld Judge Fish's decision not to dismiss the suit for lack of personal jurisdiction. *Id.* at 778-79.

*Holt Oil* is distinguishable on its facts. There, the plaintiff oil and gas company was the one that reached out to the defendant concerning a proposal to drill on land in Oklahoma in which the defendant owned part of the leasehold interest. *See id.* at 776. The parties' joint operating agreement was cemented in Texas, but the agreement provided that it was governed by Oklahoma law. *Id.* at 778. Performance of the contract was centered in Oklahoma. *Id.* And the communications to Texas rested on nothing more than the mere fortuity that the plaintiff oil and gas company happened to be a resident of the Texas forum. *Id.* In the present case, by contrast, J Projects reached out to, and negotiated the Agreement with, SpinSci in Texas, to provide consulting services and solicit business for the benefit of SpinSci's Texas-based operations. It was not a mere fortuity that SpinSci was located in Texas: Texas was the nexus between SpinSci and the CCIC Lab, which was the source of the vast majority of the revenue generated by the Agreement and the subject of a significant number of hours worked by J Projects. Unlike in *Holt Oil*, where the defendant's only Texas-related performance was his mailing three payment checks to the state, *see id.*, in the present case a material portion of J Projects' performance under the Agreement occurred in

Texas: J Projects traveled to Texas multiple times to visit Cisco's offices and to consult with SpinSci. Moreover, the Agreement provides that it is governed not only by New York law but by Texas law as well.

J Projects also extensively cites *Walden v. Fiore*, 571 U.S. 277 (2014), a recent decision by the Supreme Court of the United States. In *Walden* the plaintiffs—professional gamblers who were traveling from San Juan, Puerto Rico to Las Vegas, Nevada—were stopped by the defendant, a deputized DEA agent, in the Atlanta, Georgia airport. *Id.* at 280. The defendant seized a large sum of cash that the plaintiffs were carrying, which comprised the plaintiffs' gambling "bank" and winnings. *Id.* The plaintiffs filed suit against him in Nevada, but the Court held that a Nevada court could not exercise personal jurisdiction over the defendant. *Id.* at 280-82. *Walden* illustrates the proposition that personal jurisdiction must be premised on the defendant's contacts with the forum, not on his contacts with people who incidentally happen to be from that forum. *See id.* at 285. It also reaffirms the principle that courts may assert jurisdiction "over defendants who have purposefully 'reach[ed] out beyond' their State and into another by, for example, entering a contractual relationship that 'envisioned continuing and wide-reaching contacts' in the forum State." *See id.* (alteration in original) (quoting *Burger King*, 471 U.S. at 479-80). Obviously, the defendant in *Walden* did no reaching out of any kind—he seized cash from the plaintiffs in Atlanta, and it just so happened that the plaintiffs resided in Nevada. *See id.* at 281. He certainly envisioned no continuing, extensive relations between himself and the plaintiffs or any other resident of Nevada, and benefited in no way from the plaintiffs' residence there. The same is not true

here, however, where J Projects entered into the Agreement as a continuation of its ongoing

consulting arrangement with SpinSci—an arrangement that was performed, in part, in Texas.

*Walden* therefore provides little support for J Projects in the present case.[8]

Another factor to consider in this case is that the Agreement contained a choice-of-law

---

[8]J Projects also cites *Searcy v. Parex Resources, Inc.*, 496 S.W.3d 58 (Tex. 2016), a decision of the Supreme Court of Texas. Because the question whether the court can constitutionally exercise personal jurisdiction over J Projects is a matter of federal law, *see Mink*, 190 F.3d at 335, this court is not bound by state-court decisions. But even if it were, *Searcy* is not quite on point: unlike the Canadian defendant in *Searcy*, J Projects did indeed "reap the benefits of the Texas economy" by consulting with SpinSci regarding its Texas-based operations, and by earning commissions from soliciting business related to SpinSci's work for a Texas-based lab. *See Searcy*, 496 S.W.3d at 74. And the *Searcy* court noted that the parties included in their agreements a choice-of-law clause and a forum selection clause exclusively designating New York, suggesting that the Canadian defendant tried to *avoid* entanglements with Texas. *Id.* at 75. The same is not true here.

J Projects does not rely on *McFadin v. Gerber*, but any such reliance would be misplaced. There, the plaintiffs—manufacturers of handbags based in west Texas—entered into a long-term sales representative agreement with the defendant, who operated a showroom in Denver and showed her clients' products to retailers on sales trips throughout the Rocky Mountain region. *See McFadin*, 587 F.3d at 757. The defendant's travels never took her to Texas; the plaintiffs traveled to Colorado to negotiate and execute the contract, the purpose of which was to expand the reach of their products to the Rocky Mountain region. *See id.* at 757, 760. Despite the fact that the parties' agreement lasted for ten years, the Fifth Circuit held that the district court lacked specific jurisdiction over the defendant. *See id.* at 760. The *McFadin* court reasoned that the defendant's "little contact with Texas came only from the fortuity of the plaintiffs' residence there," that her duties under the agreement never brought her to Texas, and that the purpose of the relationship was to open up markets outside of Texas to the plaintiffs' products. *See id.* at 760-61. Here, in contrast, there is no indication that SpinSci traveled to New York or otherwise sought out J Projects' assistance; on the contrary, J Projects came into existence for the very purpose of providing services to SpinSci. Moreover, J Projects' performance under the Agreement did, in fact, bring it to Texas on multiple occasions. And the purpose of the Agreement was largely to develop SpinSci's relationship with Cisco—a relationship that was centered around Cisco's Richardson, Texas-based CCIC Lab. *See* 1st Am. Compl. Ex. A at 6-7. These factual distinctions demonstrate that *McFadin* would not support J Projects' motion.

- 18 -

clause selecting both New York and Texas law. The law applicable to a contract is important, because it may give the defendant "reason to foresee that enforcement and protection of its own rights under the contract might depend on the laws of Texas"—i.e., that the defendant might need to avail itself of the benefits of Texas law. *See Prod. Promotions, Inc. v. Cousteau*, 495 F.2d 483, 495-97 (5th Cir. 1974), *abrogated on other grounds by Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694 (1982).[9] *Stuart v. Spademan*, which J Projects cites, includes a detailed discussion of the effect of a choice-of-law provision on the specific jurisdiction analysis. *See Stuart*, 772 F.2d at 1194-96. In that case, the defendant invented a modification to a product manufactured by the plaintiff, a producer of ski equipment. *Id.* at 1187-88. The parties then entered into an agreement assigning to the plaintiff the intellectual property rights to the modification. *Id.* at 1188. The contract contained a clause selecting the law of the state in which the "aggrieved party" resided at the time of the alleged breach. *See id.* at 1194. In concluding that the district court lacked personal jurisdiction, the Fifth Circuit reasoned that a choice-of-law provision "warrant[s] some weight" in the minimum contacts analysis, but is not alone sufficient to confer jurisdiction. *See id.* at 1195. The choice-of-law clause in the present Agreement, while also not dispositive, merits more weight than the one at issue in *Stuart*. The clause in *Stuart* gave the parties virtually no guidance at the time they signed the contract as to which

---

[9]*Insurance Corp. of Ireland* characterized the specific jurisdiction test somewhat differently than did *Product Promotions*. Nonetheless, the Fifth Circuit has since reaffirmed the validity of *Product Promotions'* reasoning and holding. *See Burstein v. State Bar of Cal.*, 693 F.2d 511, 518 n.12 (5th Cir. 1982).

state's law they might eventually have to rely on to enforce their rights. Either party could conceivably have moved anywhere in the United States before a grievance arose. In the present case, by contrast, the clause in the Agreement specifically designates Texas as well as New York law.

J Projects also relies on *Stuart* to "undercut the notion that as long as *some* activity occurred in Texas, that somehow would qualify as purposeful activity." D. Reply 4. The other contacts considered in *Stuart* were indeed minimal: a smattering of communications between the parties, the plaintiff's "isolated shipment" of one of its products to the defendant for modification, and the delivery of payment checks to the defendant in Texas. *See Stuart*, 772 F.2d at 1194. The court noted that while personal jurisdiction is about more than just counting contacts, the number of contacts "is indeed one of the relevant factors to be considered within the totality of the circumstances in assessing the propriety of exercising personal jurisdiction over a nonresident." *See id.* at 1192 (citing *Std. Fittings Co. v. Sapag, S.A.*, 625 F.2d 630, 643 (5th Cir. 1980)). The contacts at issue in *Stuart* were simply too few and far between. *See id.* The same cannot be said of J Projects' contacts with Texas, which were anything but limited and sporadic. Additionally, the contract in *Stuart* was essentially a single transaction between the parties: the assignment of certain intellectual property rights. *See id.* at 1187-88. The Agreement in the present case, on the other hand, formed the basis of a longstanding and continuous working relationship between the parties, which was focused in no small part on SpinSci's operations in Texas. The present case is therefore distinguishable from *Stuart*.

In the end, no single factor discussed in the court's analysis is dispositive of the personal jurisdiction question. Rather, all the factors are assessed in tandem in an attempt to resolve the sometimes difficult question whether the defendant's contacts with the forum are purposeful and are such that the defendant "should reasonably anticipate being haled into court" there, or whether the contacts are "random," "fortuitous," or "attenuated." *See Burger King*, 471 U.S. at 474-75 (quotations omitted). J Projects was founded for the purpose of conducting business with SpinSci—a purpose that was furthered by the 2013 Agreement. Because of the three-year consulting relationship it had with SpinSci prior to signing the Agreement, J Projects was well aware that it was dealing with a company based in Texas. The parties' relationship continued for almost four years after that. Moreover, SpinSci's location in Texas was not random or otherwise irrelevant to the Agreement. Much of the work that J Projects performed under the Agreement—18% of its working hours—related to Texas, particularly to SpinSci's relationship with the CCIC Lab in Richardson, Texas. *See* Tepper Aff. ¶ 40. The CCIC Lab was also the source of more than 75% of the revenue generated by the Agreement, and resulted in roughly $470,000 of commissions being paid to J Projects. The Agreement specifically provided that it was "governed by the laws of the State of New York and Texas." And J Projects actually performed its end of the Agreement, in part, in Texas, by traveling to the state five times over the course of the parties' relationship to visit SpinSci's headquarters or Cisco's offices.

SpinSci has established a prima facie case that J Projects' minimum contacts with Texas are sufficient to support the assertion of specific personal jurisdiction over J Projects

with respect to the Agreement.

2

The crux of the minimum contacts analysis above applies with equal force to the NDA, which was signed at the inception of the parties' relationship in 2010. In the process of entering into the NDA, J Projects "reached out" to Texas and created "continuing obligations" between itself and a Texas resident concerning SpinSci's Texas-centric operations. *See Cent. Freight*, 322 F.3d at 382 (quotations omitted); *see also Burger King*, 471 U.S. at 475 (observing that defendant's creation of continuing obligations to resident of forum state can be sufficient to establish personal jurisdiction). Moreover, the NDA contains its own choice-of-law clause selecting both New York and Texas law. *Cf. Stuart*, 772 F.2d at 1195 (noting that choice-of-law provisions merit some weight in minimum contacts analysis). Plus, the parties clearly contemplated that their performance of the NDA would be inextricably bound up with their business consulting agreements: they agreed to the NDA and the initial business consulting agreement contemporaneously, and the 2013 Agreement itself references and reaffirms the NDA. *See* 1st Am. Compl. Ex. A ¶ 4. The NDA is therefore closely tied to agreements that were in part performed in Texas. *Cf. Command-Aire*, 963 F.2d at 94 (emphasizing importance of place of performance). These contacts are sufficient to confer specific jurisdiction in this forum over the parties' intellectual property dispute.

D

Exercising jurisdiction over J Projects would not offend traditional notions of fair play or substantial justice. "If the required minimum contacts are shown, jurisdiction exists unless the defendant can make a 'compelling case' that traditional notions of fair play and substantial justice would be violated by the exercise of jurisdiction." *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 615 (5th Cir. 2008) (quoting *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 215 (5th Cir. 1999)). "It is rare to say the assertion [of jurisdiction] is unfair after minimum contacts have been shown." *Wien Air Alaska*, 195 F.3d at 215 (citation omitted). Although it will be a burden on J Projects to appear in court in Texas, J Projects has already demonstrated an ability and a willingness to travel to Texas by doing so multiple times over the course of its relationship with SpinSci. Plaintiff's legitimate interest in convenient and effective relief is certainly satisfied by litigating in a Texas forum. Texas, moreover, has an interest in overseeing the resolution of the present dispute because it involves a Texas-based company. *See id.* ("Texas clearly has an interest because the dispute involves a corporation whose principal place of business is in Texas . . . ."). And given that SpinSci's witnesses and evidence are likely located in Texas, it would not be judicially inefficient to resolve the case here. *See id.* In light of these considerations, the case before the court is not one of the "rare" cases where asserting jurisdiction would be unfair or unjust.

Accordingly, the court denies J Projects' Rule 12(b)(2) motion to dismiss for lack of

personal jurisdiction.[10]

III

J Projects moves under Rule 12(b)(6) to dismiss in part SpinSci's first amended complaint for failure to state a claim on which relief can be granted. It contends that the parties' dispute over J Projects' alleged right to a share of the proceeds from any future sale, change in ownership, or other exit event involving SpinSci is not yet ripe—although this argument relates only to a single, narrow issue in the case.[11] SpinSci responds that J Projects' claims in the parallel New York Suit are enough to prove that the dispute is ripe for adjudication.

---

[10]SpinSci requests in the alternative that the court authorize jurisdictional discovery. Because the court holds that SpinSci has already made a prima facie case for personal jurisdiction, the court declines in its discretion to authorize such discovery. *See Hunter v. Branch Banking & Tr. Co.*, 2012 WL 5845426, at *1 (N.D. Tex. Nov. 19, 2012) (Fitzwater, C.J.) (quoting *Bryant v. Holder*, 809 F.Supp.2d 563, 571 (S.D. Miss. 2011)) ("The Court possesses a substantial amount of discretion when addressing requests for jurisdictional discovery."); *see also Wyatt v. Kaplan*, 686 F.2d 276, 283 (5th Cir. 1982) ("The district court . . . has broad discretion in all discovery matters.").

[11]In the first paragraph of its ripeness argument, J Projects briefly cites language from the first amended complaint alleging that J Projects has no ownership, partnership, or equity interest in SpinSci. *See* D. Mot. Dismiss 23. But the substance of defendant's argument is that it would be premature to adjudicate now J Projects' rights under the Agreement upon the occurrence of a future exit event. *See id.* at 24-25. The court understands J Projects to be moving to dismiss the cited claim to the extent that a contractual interest in future exit event proceeds might be characterized as an ownership, partnership, or equity interest in SpinSci—as well as moving to dismiss any other claim dependent upon the future operation of the relevant clause of the Agreement. J Projects' Rule 12(b)(6) argument expressly does not apply to the "balance" of the disputes between the parties, however, such as whether J Projects is owed certain additional commission payments, a refund on the discount it included in its commission rate, or an ownership interest in certain intellectual property. *See id.* at 2.

## A

Under Rule 12(b)(6), the court evaluates the pleadings by "accept[ing] 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)). To survive a motion to dismiss, SpinSci must allege enough facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*; *see also Twombly*, 550 U.S. at 545 ("Factual allegations must be enough to raise a right to relief above the speculative level[.]"). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Rule 8(a)(2)). Furthermore, under Rule 8(a)(2), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Although "the pleading standard Rule 8 announces does not require 'detailed factual allegations,'" it demands more than "labels and conclusions." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). And "a formulaic recitation of the elements of a cause of action will not do." *Id.* (quoting *Twombly*, 550 U.S. at 555).

Under the federal Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, a federal court has the competence, but not the duty, to declare rights. *Pub. Affairs Assocs., Inc. v. Rickover*, 369 U.S. 111, 112 (1962) (collecting cases). "Declaratory judgments are typically sought before a completed 'injury-in-fact' has occurred but still must be limited to the resolution of an 'actual controversy.'" *United Transp. Union v. Foster*, 205 F.3d 851, 857 (5th Cir. 2000) (citation omitted). The ripeness doctrine, which is based on Article III's "'case' or 'controversy'" requirement, is designed to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Choice Inc. of Tex. v. Greenstein*, 691 F.3d 710, 715 (5th Cir. 2012) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967)). In determining whether a case is ripe, "[t]he key considerations are the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* (quoting *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 833 F.2d 583, 586 (5th Cir. 1987)).

"In the declaratory judgment context, whether a particular dispute is ripe for adjudication turns on whether a substantial controversy of sufficient immediacy and reality exists between parties having adverse legal interests." *Venator Grp. Specialty, Inc. v. Matthew/Muniot Family, LLC*, 322 F.3d 835, 838 (5th Cir. 2003). "Whether particular facts are sufficiently immediate to establish an actual controversy is a question that must be addressed on a case-by-case basis." *Orix Credit All., Inc. v. Wolfe*, 212 F.3d 891, 896 (5th Cir. 2000). "The threat of litigation, if specific and concrete, can indeed establish a controversy upon which declaratory judgment can be based." *Id.* at 897. If the threat of

litigation is contingent upon particular future events, the court must take the likelihood of those contingencies into account—although this "does not necessarily defeat jurisdiction over a declaratory judgment action." *See Lower Colo. River Auth. v. Papalote Creek II, L.L.C.*, 858 F.3d 916, 924 (5th Cir. 2017).  When a contingency is entirely within the control of the plaintiff, the question becomes whether it is sufficiently likely that the plaintiff will bring about that contingency.  *See id.* at 925; *see also* 13B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3532.4, at 538-39 (3d ed. 2004 & Supp. 2018) ("The plaintiff's control of future contingencies triggers the concern that the events that would raise the proffered questions may never happen. . . .  [I]t remains necessary to adjust for the plaintiff's control in the same way as other contingencies are accommodated in ripeness doctrine.").

## B

The court holds in the circumstances of this case that the parties' controversy over J Projects' rights (if any) to a portion of the proceeds from a future sale, exit event, or change in ownership of SpinSci is not yet ripe.  The relevant provision of the Agreement states: "[SpinSci] intends to share with [J Projects] some portion of the proceeds received upon the sale, exit event and/or change in ownership of [SpinSci].  This said intention of [SpinSci] will be defined in a separate agreement to be executed during the term of this Agreement . . . ." 1st Am. Compl. App. Ex. A at 1.  J Projects contends that the question whether this provision entitles it to any future proceeds should not yet be adjudicated because no qualifying exit event has occurred, SpinSci has not alleged that any such event is impending, and SpinSci

is in full control of all relevant contingencies—i.e., whether an exit event will ever occur, and, if it does, whether SpinSci will share any proceeds with J Projects. SpinSci responds by relying on the amended complaint that J Projects filed in the New York Suit, arguing that the parallel New York case shows that litigation is not just likely—it has already occurred.[12]

SpinSci's argument ignores the somewhat subtle but significant distinctions between the matter at issue in the present motion and the matters at issue in the New York Suit. Of the ten causes of action alleged in the amended complaint in the New York Suit, six relate to the contractual provision relevant here. *See* Am. Compl. ¶¶ 86-120, *J Projects, LLC v. SpinSci Tech., LLC*, 1:18-CV-00170 (N.D.N.Y. Feb. 28, 2018). Two of them—fraudulent misrepresentation and negligent misrepresentation—are tort claims, whereas the present issue sounds in contract. *See id.* ¶¶ 86-98. Similarly, J Projects' unjust enrichment claim, *see id.* ¶¶ 116-20, is not a contract claim per se but rather a "quasi contract" remedy with distinct common-law elements, *see Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005) (Sotomayor, J.) (discussing New York law, under which recovery on theory of unjust enrichment or quantum meruit is incompatible with recovery on breach of contract claim); *see also Walker v. Cotter Props., Inc.*, 181 S.W.3d 895, 900 (Tex. App. 2006, no pet.) ("A contract implied in law, or a quasi-contract, is

---

[12]The court takes judicial notice of the contents of the amended complaint in the New York Suit for purposes of deciding this motion. *See Norris v. Hearst Tr.*, 500 F.3d 454, 461 n.9 (5th Cir. 2007) ("[I]t is clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record."). The court does not take judicial notice of the truth of the facts alleged in the amended complaint but instead that these facts have been alleged.

distinguishable from a true contract because a quasi-contract is a legal fiction, an obligation imposed by law regardless of any actual agreement between the parties."). And J Projects' New York Suit claims for promissory estoppel, breach of contract, and breach of the implied duty of good faith and fair dealing appear to allege that SpinSci is *presently* in breach of the Agreement for failing to negotiate and enter into an acceptable contract for distributing future exit event proceeds; this is a shade different from the question whether the Agreement, standing alone, *will* obligate SpinSci to share proceeds with J Projects once a qualifying event occurs. *See* Am. Compl. ¶¶ 99-115, *J Projects, LLC v. SpinSci Tech., LLC*, 1:18-CV-00170 (N.D.N.Y. Feb. 28, 2018). The court therefore declines to conclude that the existence of the New York Suit is proof that the claim at issue here is ripe.

Nor does the first amended complaint plausibly allege any other facts suggesting that an exit event is impending, or that SpinSci does not intend to share the proceeds of any such event with J Projects. This is significant because, when the possibility of future litigation is contingent upon whether the plaintiff will eventually breach a contract, the question of ripeness turns on the likelihood of that breach's occurring. *See Lower Colo. River Auth.*, 858 F.3d at 925 ("Although it is not an absolute prerequisite for ripeness for there to be a contractual breach, there is no evidence that [plaintiff] threatened to [breach] or that such a decision was even likely."). In the absence of any plausibly alleged facts showing that an exit event and subsequent breach are likely, the court cannot hold that the instant dispute is ripe.

It is important to delineate the exact contours of the narrow claim that the court is

dismissing here. The court will adjudicate any dispute concerning whether SpinSci is *presently* in breach of the Agreement for failing to enter into an additional contract with J Projects regarding the distribution of future exit event proceeds. And if J Projects asserts as a counterclaim that SpinSci has *already* committed the tort of negligent or fraudulent misrepresentation, the court will adjudicate that as well. But the court cannot now adjudicate the issue whether SpinSci will be in breach of the Agreement in the *future* if, upon the occurrence of a qualifying exit event, SpinSci does not share with J Projects the proceeds of that event.

## C

Although the court is granting J Projects' motion to dismiss, it will permit SpinSci to replead. *See Clemmer v. Irving Indep. Sch. Dist.*, 2014 WL 2475924, at *5 (N.D. Tex. June 3, 2014) (Fitzwater, C.J.) (granting defendant's motion for partial dismissal but allowing plaintiffs to replead, noting that "[d]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case." (quoting *In re Am. Airlines, Inc., Privacy Litig.*, 370 F.Supp.2d 552, 567-68 (N.D. Tex. 2005) (Fitzwater, J.))). Plaintiffs are often able to state plausible claims for relief when amending after a motion to dismiss has been granted. *See, e.g., Reneker v. Offill*, 2010 WL 1541350, at *2, *7 (N.D. Tex. Apr. 19, 2010) (Fitzwater, C.J.) (after twice granting motions to dismiss, concluding that plaintiff's second amended complaint stated claim on which relief could be granted). Accordingly, the court grants SpinSci 28 days from the date this memorandum opinion and order is filed to file a second amended complaint.

* * *

For the reasons stated, the court denies J Projects' motion to dismiss under Rule 12(b)(2), grants J Projects' motion to dismiss under Rule 12(b)(6), and grants SpinSci leave to file a second amended complaint within 28 days of the date this memorandum opinion and order is filed.

**SO ORDERED**.

September 7, 2018.

_____
SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE